Petra **VALENCIA,** widow of Raymond A. Valencia, Sr., deceased; Santa Estella Mork, Guadalupe Valencia, and Rosa Maria Jacinta Valencia, natural and surviving children of Raymond Valencia, Plaintiffs,

v.

**UNITED STATES** of America, Defendant.

Civ. 90–351–TUC–WDB(NF).

United States District Court,
D. Arizona.

Jan. 29, 1993.

Alexander L. Sierra, Kerley & Sierra, Tucson, AZ, for plaintiffs.

Cindy K. Jorgenson, Asst. U.S. Atty., Tucson, AZ, for defendant.

## AMENDED FINDINGS OF FACT; CONCLUSIONS OF LAW; OPINION AND ORDER

FIORA, United States Magistrate Judge.

This is a wrongful death action brought against the United States of America under the Federal Tort Claims Act, Title 28, United States Code, Section 2671, *et seq.*, by plaintiffs, Petra Valencia (Mrs. Valencia), widow of Raymond A. Valencia, Sr., and their three adult daughters, Santa Estella Mork (Estella), Guadalupe Valencia (Guadalupe), and Rosa Maria Jacinta Valencia (Rosa). Raymond Valencia, Jr., who was also a plaintiff in this action, was voluntarily dismissed with prejudice on April 26, 1991. Plaintiffs claim that decedent died as a result of negligence by Patricia Mayer, M.D., in the diagnosis, care, and treatment of decedent at the Life Support Unit (LSU) of the Veterans Administration Medical Center (VAMC) on Saturday, March 11, 1989.

Plaintiffs claim that the United States of America, through its employee, Dr. Mayer, was negligent in failing to properly diagnose decedent's condition, in failing to provide appropriate treatment and in failing to admit decedent in response to a telephone call from the family made two hours subsequent to decedent's departure from the LSU.

This matter came on for trial to the court without a jury on November 5th, 6th and 7th, 1991, and January 16th and 17th, 1992.

Pursuant to Federal Rule of Civil Procedure 52, the court makes the following Findings of Fact and Conclusions of Law.

## INTRODUCTION

The facts before us are complicated and tragic. The Valencia family has lost the husband and father they worked for so many years to nurture, sustain and keep at the heart of their family. It is difficult to accept that one who has been so well loved and carefully attended by his family has fallen, despite their diligence, alone and unseen, and has died days later, despite the family's most vigorous efforts to keep him with them. Mr. Valencia suffered for many years from multiple ailments, enduring both psychological and physical distress. He was blessed with a close and loving family, which did not hesitate to tend to his needs as they could, or to seek professional attention for him whenever the need arose.

On the weekend of March 11, 1989, family members were willing to help him care for himself; they assisted him eating, drinking and moving about as needed. Mr. Valencia did not want their assistance in the bathroom. In pain and very weak, Mr. Valencia went, unassisted, into the bathroom and alone there he collapsed. The care and treatment of Mr. Valencia at the VAMC on March 11, 1989, the day before his collapse, constitute the gravamen of this complaint.

Mr. Valencia's medical condition was such that the experts, after all the examinations of tests and reviews of his medical history, are unable to reach accord as to the cause of his death on March 15, 1989. So numerous were the assaults upon his body at the time of his collapse that it is impossible for the experts to agree even upon the cause of his collapse on March 12, 1989.

What is clear to the court, on the record before us, is that Mr. Valencia's death was not the result of medical malpractice.

## FINDINGS OF FACT

*Factual Background:*

1. Raymond A. Valencia, Sr. (decedent) died on March 15, 1989, at Kino Community Hospital (Kino) in Tucson, Arizona, at the age of 51, having been released from the VAMC by Dr. Mayer on March 11, 1989.

2. On Saturday, March 11, 1989, during flu season, decedent awoke early, as was his custom, and soon thereafter complained of a sudden onset of chest pain and shortness of breath. Family members called for emergency ambulance service, which service they had used many times.

3. Tucson Fire Department paramedics responded. The paramedics placed decedent on 12 liters of oxygen, a normal amount of oxygen provided by those paramedics to a person with chest pain. Decedent's respiratory rate (RR), taken by the paramedics, was 20.

4. Paramedic time spent at the scene and in transporting decedent to the hospital totalled approximately 15 minutes. Throughout the course of contact between decedent and the paramedics, decedent's responses were normal; eye opening was spontaneous; RR, pulse and blood pressure were regular; eyes functioned normally; and decedent was oriented and able to obey commands. Decedent was warm and dry, his color was good, and he had no nausea. Decedent reported to the paramedics that his pain increased upon deep inspiration.

5. At approximately 7:50 a.m. on March 11, 1989, the ambulance brought decedent to the VAMC LSU. Decedent was a veteran of the United States Armed Forces and therefore entitled to medical treatment at the VAMC.

6. When the ambulance arrived at the LSU, Dr. Mayer, a resident, was the one physician on duty, along with one nurse practitioner, Paula Goldthorpe, R.N.P., and one clerk. Dr. Mayer is a Board Certified Internist and is Board-eligible in Rheumatology, which is her current practice. Her duties on March 11, 1989, included diagnosis and treatment of patients needing care at the LSU.

7. Dr. Mayer took decedent off oxygen when he first got to the VAMC. She believed oxygen was inappropriate for him because he suffered from chronic obstructive pulmonary disease (COPD). Thereafter he breathed room air (RA). Estimated time decedent was on oxygen administered by the paramedics is approximately 15 minutes.

8. Upon arrival at the LSU, decedent's chief complaint was chest pain. He had pain upon deep inspiration and no shortness of breath. At the LSU, Dr. Mayer examined decedent and reviewed his medical history. She took his vital signs, drew venous blood for Complete Blood Count and Differential (CBC and Differential) and arterial blood for Arterial Blood Gases (ABGs). She recorded her findings and decedent's past medical history on the LSU report (Defendant's Exhibit 26, pp. 20, 22).

9. The LSU report is the LSU record of decedent's presentment, condition, examination, findings and treatment on March 11, 1989. It reflects decedent's subjective presentation: a 51–year old male with onset that morning of right pleuritic chest pain, chills and fever. Decedent claimed no cough, mild shortness of breath with onset of fever, but no shortness of breath at the LSU. Pain was experienced only on deep inspiration and not associated with exertion.

10. There is a discrepancy in the record between the LSU Report and the Diagnostic Radiology Report (Defendant's Exhibit, 26, p. 7) regarding the existence of a cough. The x-ray report shows decedent had a cough; the LSU report is *contra.*

11. The LSU report also bears the results of Dr. Mayer's physical examination of

decedent as shown in her objective findings: An Hispanic male wheezing upon inspiration/expiration; his cardiovascular condition presented with regular rate and rhythm and there was no tenderness to palpitation of his chest. His abdomen was not tender and he had no skin infection. He presented with a fever of 102.5° and blood pressure 200/116. Dr. Mayer's final objective finding was chest pain resolved prior to discharge. The objective findings also show decedent was "shivering."

12. Dr. Mayer wrote "shivering" after she whited-out the words "having rigors." Physicians are trained never to erase or white-out a notation. Corrections are properly made by drawing a line through any portion to be deleted and adding the correction alongside the delineated portion.

13. Dr. Mayer determined, from decedent's medical history, that he was being treated for seizures with Tegrital, Phenobarbital and Dilantin. She also determined decedent had been treated in the past for a stroke, hypertension, peptic ulcer disease, pneumonia, COPD, sometimes referred to as emphysema, and Barrett's esophagus, a premalignant lesion in the esophagus. Decedent was a chronic smoker and had been treated for alcoholism.

14. In addition to drawing blood for three blood tests, ABGs, CBC and Differential, and blood culture, Dr. Mayer did a urinalysis and an electrocardiogram (EKG), and ordered a portable chest x-ray.

15. The VAMC record shows that the test for ABG results was run at 8:43 a.m.

16. Dr. Mayer compared the ABG results of March 11, 1989, to those of a prior May 13, 1988 ABG test, run when decedent was discharged from the VAMC after treatment for pneumonia. Decedent's $PO_2$ (partial pressure of oxygen) on both dates was 65.

17. On Saturday, March 11, 1989, the day at issue, no radiologist was on duty, nor was the x-ray department staffed, except for one x-ray technician. The x-ray technician was summoned to take a portable x-ray. The x-ray showed no infiltrate on the lungs.

18. The record is unclear as to when the VAMC Radiologist read that x-ray. It was most likely read on March 13, 1989, 2 days after it was taken at Dr. Mayer's request and read by her. The VAMC Radiologist's reading of the same x-ray confirmed the absence of any infiltrates.

19. Dr. Mayer compared the March 11, 1989 x-ray with decedent's most recent prior x-ray, taken on May 12, 1988, when decedent was treated for pneumonia.

20. Dr. Mayer had the x-ray taken because she was looking for pneumonia. She opted for a portable x-ray, as opposed to sending decedent to radiology for a two-view x-ray, because no hospital staff was available to accompany decedent to radiology, which is about a city block's distance from the LSU. A patient sent there at that time would have been without medical supervision, and most probably would have had to wait quite some time for service.

21. Dr. Mayer marked a "yes" on the LSU inquiry as to whether ambulatory care was necessary to obviate hospitalization. That means she authorized his return for outpatient care if necessary.

22. Shivering, fever, aching muscles and pains are common flu symptoms.

23. Since she could find no evidence of infiltrates, or bacterial infection, Dr. Mayer's assessment was probable viral syndrome.

24. Just prior to discharging decedent, Dr. Mayer noted decedent's chest pain had subsided and his blood pressure was down to normal, 150/81, as was his pulse, 90.

25. After explaining the test results to the family, Dr. Mayer discharged decedent and recommended "[b]edrest," "[l]ots of fluids,", no alcohol or cigarettes, Tylenol and "[r]eturn if worsening" symptoms, especially "productive cough" and "[c]ontinue seizure meds." Defendant's Exhibit 26, p. 20.

26. Dr. Mayer advised the family orally, as well as in her written plan, to return if decedent's symptoms worsened, especially if he developed a productive cough. The record is clear and uncontroverted that Dr. Mayer told the family to contact her if there was any change in decedent's condition. Dr. Mayer and family members so testified.

27. Contrary to Dr. Mayer's physical findings, family members who were at the LSU testified at trial that decedent's condition did not appear to improve while he was at the LSU or at the time of his discharge.

28. Approximately two hours after decedent's discharge from the hospital, his stepdaughter, Petra Salazar Clark (Petra), who acted as spokesperson for the family at the hospital and thereafter, called Dr. Mayer on behalf of Mrs. Valencia to ask that decedent be admitted to the hospital for observation overnight, or, in the alternative, that the family be given oxygen for his use at home. In response to Dr. Mayer's questions, Petra stated that decedent's condition had not changed or worsened.

29. Dr. Mayer refused to admit decedent for observation. She advised plaintiffs that decedent had a bad flu, or virus, and that he would be having a few very bad days.

30. Dr. Mayer declined to send oxygen out to the house for two reasons: (1) the VAMC requires that a patient must show a $PO_2$ of 50 before the VAMC will pay for the oxygen (decedent's was 65, his normal reading); and (2) decedent, who tended to retain carbon dioxide ($CO_2$), had a $PCO_2$ (partial pressure carbon dioxide) of 48, which indicated carbon dioxide retention. Normal is around 40. Oxygen can raise that level even higher, causing a medically dangerous situation.

31. The record is clear and uncontroverted that at no time during that conversation did Petra tell Dr. Mayer that decedent's condition was worse or that he had developed a productive cough. Trial Transcript (TT), Nov. 5, pp. 219, *et seq.;* TT, Nov. 6, pp. 36, *et seq.;* TT, Nov. 7, pp. 106, *et seq.,* 146, *et seq.*

32. At trial, all family members testified that decedent's condition got no worse after he was discharged from the LSU. However, Estella testified that her father's ability to speak diminished from Saturday to Sunday afternoon.

33. Kino records show that family members told Dr. Hortencia Taylor, the physician on duty at Kino the night that decedent was brought there, March 12, 1989, that his condition worsened after he was discharged from the LSU.

34. Raymond, Jr. testified at his deposition that his father did get worse in the hour or so that he was at the house on Sunday afternoon.

35. On March 12, 1989, at approximately 5:30 p.m., family members found decedent alone in the bathroom. He was unresponsive. Family members were unsure how long decedent had been alone in the bathroom. It could have been a long time. They attempted CPR and called for emergency help.

36. Paramedics responded and transported decedent to Kino, where he remained unresponsive; his neurological status was very poor.

37. Later that evening, a portable chest x-ray revealed pneumonia, and decedent was immediately placed on antibiotic therapy and life support machines, including a ventilator.

38. Blood samples were also taken which ultimately revealed pneumococcal pneumonia.

39. Decedent's pneumonia improved. His neurological status did not, and he was diagnosed brain dead.

40. After family consultation and agreement, Mrs. Valencia consented to removing the life support machines and Mr. Valencia was pronounced dead on March 15, 1989.

*Decedent's Medical History:*

Decedent had a lengthy history of numerous emergency ambulance visits to the VAMC,[1] related to seizure episodes suffered by him as a result of a head injury sustained in the early 1970s. Visits were also related to COPD, diagnosed in the early 1980s, hypertension, a long history of gastrointestinal pathology, peptic ulcer disease, Barrett's

---

1. The family was accustomed to using emergency services for emergencies or when other transportation was not available. Guadalupe testified that the family used ambulance service to transport their father to the hospital all the time. "[E]very time my father got sick we'd always call the ambulance, no matter what." TT, Nov. 6, p. 75, lines 7–8. Rosa testified that she remembered at least ten times that her father had seizures at home and an ambulance was always called.

esophagus, alcoholism, and depression. Decedent was unemployed and on disability since the early 1970s.

The VAMC medical records reflect a long and varied medical history spanning twenty years, for which the VAMC file alone is approximately five inches thick. A brief summary of that record is helpful:

In 1973, decedent suffered a possible stroke with a secondary fall and skull fracture, which left him with a seizure disorder. This disorder caused decedent to suffer reoccurring seizures. Although the severity and regularity of the seizures varied, medical records and testimony indicate that decedent's seizures ranged from one to two blackouts with convulsions per week, to one or two every three months. Decedent's last recorded seizure occurred in January, 1989, about two months prior to his death. Medical records at the VAMC and Kino over a period of many years reveal that decedent was subtherapeutic, or failed to maintain proper seizure medication levels, on many occasions. That could have been the cause of seizure reoccurrence.

All family members were aware that decedent suffered seizures. Rosa witnessed about 15 seizures. Petra knew of only one seizure and did not remember the family talking about others. Mrs. Valencia testified that the seizures occurred once a month or every two or three months.

Decedent also suffered from COPD. He smoked approximately one pack of cigarettes a day for thirty-five (35) years, up until the time of his death. Expert testimony regarding the severity of the COPD is contradictory. Dr. Silver, the pathologist, testified that it was not very severe. Dr. Bloom, a pulmonologist, testified that decedent's COPD was severe.

Testimony of family members regarding decedent's seizures and general health is also inconsistent. Decedent's natural children testified that their father had an alcohol abuse problem. His stepdaughter, Petra, testified at deposition that she was aware of decedent's treatment for alcoholism. At trial, she denied the same. Petra testified at trial that she did not know why her father was in alcohol rehabilitation. Mrs. Valencia, decedent's wife, also denied that he abused alcohol. Rosa, Guadalupe and Raymond, Jr. each remembered at least one time that their father was admitted a week or more for inpatient alcohol treatment. Estella remembered two separate times when her father received alcohol treatment. Guadalupe testified that decedent continued to drink alcohol after the inpatient alcohol treatment. Guadalupe and Raymond, Jr. agreed that decedent drank approximately a six-pack of beer a day until 1985, when that amount was drastically reduced. However, Guadalupe estimated the reduced amount to be two to three cans a day. Raymond, Jr. estimated it to be about one can a day. Petra testified that decedent always drank only one can of beer a day, except for special occasions. Years prior to his death, decedent reported that he drank only occasionally. However, on March 13, 1989, at Kino, family members told Nurse Ferguson that decedent's drinking habit was one to two beers per day.

None of the children were aware of decedent's COPD. They each testified that their father did not have problems breathing and that he did not wheeze. Mrs. Valencia testified that her husband had a consistent cough. However, she also said that he did not develop a cough on March 11 or 12, 1989. See this Opinion, pages 1453–54, FN8.

Petra testified that decedent smoked consistently throughout his life. Raymond, Jr. testified in deposition that his father was not a heavy smoker, that he smoked about five cigarettes a day. Mrs. Valencia, however, testified that her husband smoked a pack to a pack and a half a day. The latter is in accord with the Kino Admission Assessment of March 12, 1989, which notes that decedent smoked a pack a day.

Decedent was treated for depression at the VAMC in 1988.

Decedent, who stood five feet seven inches and weighed 220 pounds, also had a history of obesity.

In March of 1989, decedent was supposed to be taking medications for ailments including high blood pressure and seizures. Dece-

dent was also scheduled for a hernia operation the week that he died.

## PLAINTIFFS' CONTENTION AND EVIDENCE

Plaintiffs contend that Dr. Mayer's actions fell below the standard of care in her diagnosis and treatment of decedent, causing Mr. Valencia's death.

Plaintiffs claim that decedent died of pneumonia, that his death was caused by Dr. Mayer's failure to diagnose and treat that pneumonia at the LSU on March 11, 1989, and that his death was caused by Dr. Mayer's failure to to admit decedent to the VAMC in response to the family's phone call two hours subsequent to their departure from the LSU.

Plaintiffs place their principal reliance upon the testimony of Dr. Gallagher, who testified on their behalf at length and in great detail, said length and detail being necessitated by Dr. Gallagher's extensive and virtually all-inclusive negative critique of Dr. Mayer's work.

### Dr. Gallagher:

John V. Gallagher III, M.D., is Board Certified in Emergency Medicine and is an emergency physician and Director of Paramedic Training at St. Luke's Medical Center in Phoenix, Arizona.

Dr. Gallagher found that Dr. Mayer fell below the standard of care in both her evaluation and treatment of decedent at the LSU on March 11, 1989.

According to Dr. Gallagher, Dr. Mayer erred when she did not admit decedent to the hospital; he would have done so because of decedent's elevated white blood count (WBC), hypoxia or low oxygen level, and carbon dioxide ($CO_2$) retention. He would

have admitted decedent for oxygen therapy and for antibiotic therapy.

Because Dr. Gallagher's criticism of Dr. Mayer's work is so extensive and so detailed, it is helpful here to summarize and examine briefly each component of that criticism:

1. The Respiratory Rate (RR):

Dr. Gallagher found "a glaring deficiency" in Dr. Mayer's failure to record decedent's RR. TT, Nov. 5, p. 54, line 19. Dr. Gallagher found that omission by Dr. Mayer sufficient in and of itself to bring Dr. Mayer's work below the standard of care.[2]

2. Time Lapse Between Removal of Oxygen and Drawing of Blood:

Dr. Gallagher found fault also in the time lapse allowed by Dr. Mayer between the removal of the oxygen supply and the taking of decedent's ABGs. Dr. Gallagher believed Dr. Mayer did not wait long enough, that she probably waited only 10 minutes or less.[3] He would have waited 30 minutes because the 12 liters of oxygen administered by the paramedics were "a tremendous amount of oxygen to put on this patient at that time." TT, Nov. 5, p. 57, lines 16–18. He testified that decedent had been on the supplemental oxygen about 15 minutes and that the oxygen would have made decedent, who was actually hypoxic, appear falsely to have a normal oxygen level.[4]

3. Interpretation of the ABG Results:

Dr. Gallagher found fault with Dr. Mayer's interpretation of decedent's ABG results. He found decedent's $PO_2$ of 65 to be below normal and $PCO_2$ of 48 to be above normal. Dr. Gallagher also testified that the ABG results were faulty because Dr. Mayer left

**2.** In deposition, Dr. Gallagher relied upon the RR recorded by the paramedics, expressing concern about decedent's high RR. However, at trial, he complained about the omission of an RR from Dr. Mayer's LSU report and did not reference decedent's high RR at all in direct testimony.

**3.** Dr. Gallagher opines the blood was drawn too soon, at 8:00 a.m., based upon a marginal notation on the LSU report, "8:00 sent PG". Defendant's Exhibit 26, p. 22. However, Nurse Gold-

thorpe, who authored the notation, testified that, although she did not recollect this particular case, she assumed that the notation referred to the bloods that are listed, the venous bloods. See, summary of Nurse Goldthorpe's testimony, this Opinion, page 1456–57.

**4.** Dr. Gallagher conceded that a pulmonologist would have more expertise on this matter. See summary of Dr. Bloom's testimony, this Opinion, page 1456.

too little time for the oxygen to wash out of decedent's system, thereby causing an inaccurate ABG reading. He believed decedent's $PO_2$ was even lower than the 65 result obtained.

4. Comparison of March 11, 1989 ABGs With Those of May 13, 1988:

Dr. Gallagher also found fault with Dr. Mayer's use of decedent's May 13, 1988 ABGs for comparison with the March 11, 1989 results. The May 13, 1988 ABGs were quite close to the results obtained on March 11, 1989: $PCO_2$ was 44 and $PO_2$ was 65. It is Dr. Gallagher's opinion that Dr. Mayer should not have used the May 13, 1988 ABGs for comparison, or baseline, because decedent had pneumonia at that time, and therefore the May 13, 1988 results were not his true baseline.

5. Interpretation of the CBC and Differential Results:

Dr. Gallagher also found fault with Dr. Mayer's failure to address what he perceived as numerous abnormal readings in decedent's CBC and Differential. Decedent's WBC was 19.1; normal is 4.5 to 11. Dr. Gallagher explained that "[m]ost of the time when the white blood count goes up to ... this mark, it's because of a bacterial infection." TT, Nov. 5, p. 73, lines 16–18. All of the readings—segs of 76, bands of 10, lymphocytes of 10—were the reverse of what they would be if decedent were suffering from a viral, as opposed to a bacterial, infection.[5]

6. Use of the Portable X-ray:

Dr. Gallagher found fault with Dr. Mayer's use of and reliance upon the portable x-ray. His criticism is two-fold: (1) the x-ray itself was of poor quality and technically inade-

quate, and (2) decedent should have been sent to Radiology for a two-view x-ray.

Specifically, Dr. Gallagher found the quality of the film to be poor and the technique for penetration, as well as the angle of the x-ray, to be inadequate. "The lungs and soft tissues are not well penetrated in terms of showing up things very clearly on this film." TT, Nov. 5, p. 86, lines 14–16. When he looked at the film, Dr. Gallagher "felt that there was something there that was abnormal" and that in the "left lower lobe area ... there could be an infiltrate." TT, Nov. 5, p. 87, lines 6–14.[6]

Dr. Gallagher also found fault in Dr. Mayer's reliance upon an x-ray for diagnosis of pneumonia because he does not agree that an x-ray is the gold standard for determining pneumonia.[7]

7. Refusal to Admit for Observation or Provide Home Oxygen:

Dr. Gallagher testified that when the family phoned Dr. Mayer two hours after decedent was discharged from the LSU she should have advised them to bring decedent back to the VA for re-evaluation. "I think that it's prudent when a patient's family calls back and says the patient is still having problems to re-evaluate the patient at that time. Family members are not trained to do physical assessment or diagnosis and I would not rely upon them to be able to decide whether a patient was having a serious problem or not." TT, Nov. 5, p. 101, lines 18–25.

8. Miscellaneous Criticisms:

Bolstering his opinion that decedent had pneumonia which Dr. Mayer failed to diagnose, Dr. Gallagher believed that decedent did have a cough, despite Dr. Mayer's LSU finding and the testimonies of Petra, Guadalupe and Rosa that he did not.[8]

---

**5.** Later, on cross examination, Dr. Gallagher acknowledged that any kind of stress can cause an elevated WBC, as can a virus.

**6.** Later, on cross examination, Dr. Gallagher stated, "I did not say infiltrate." TT, Nov. 5, p. 136, line 2. He then said, "I could not specifically say there is infiltrate present there.... I don't know what is causing that" whiteness or lightness of the film. TT, Nov. 5, p. 136, lines 5–10. Finally he testified that he was not render-

ing an opinion that there was an infiltrate on the portable x-ray.

**7.** Later, on cross-examination, Dr. Gallagher agreed that a classical finding in pneumonia is a positive chest x-ray and a cough.

**8.** Mrs. Valencia's testimony regarding whether or not decedent had a cough on March 11 and 12, 1989, is inconsistent and unclear. Her initial

Dr. Gallagher held Dr. Mayer responsible for the discrepancy between her LSU Report note, "no cough," and the contradictory Diagnostic Radiology Report, which lists "cough" as part of decedent's clinical history. Defendant's Exhibit 26, pp. 7, 22. When an x-ray is requested, a requisition form is filled out with the patient's name and clinical history. The information from that form is then included in the Diagnostic Radiology Report. Dr. Gallagher opined that Dr. Mayer both authored the LSU notation "no cough" and supplied the conflicting "cough" information for the Diagnostic Radiology Report.[9]

Dr. Gallagher found fault with Dr. Mayer's use of white-out on her LSU report to change "having rigors" to "shivering." Changes to the record should be made by drawing a line through the erroneous word(s), and annotating the change next to the delineation, and initialing and dating the change. Dr. Gallagher attached great significance to that correction by Dr. Mayer because it was his opinion that the manifestations of rigors and shivering are visibly and significantly different, and that rigors is indicative of a bacterial infection. Hence, his suggestion is that Dr. Mayer whited-out her original finding of a bacterial infection and replaced that with a symptom of a viral infection.

Finally, after stating on cross-examination that he had no criticism of Dr. Mayer's taking of decedent's urine sample, Dr. Gallagher changed his mind and declared yet another deficiency in Dr. Mayer's work because a urine dip was not sufficient. He opined that Dr. Mayer should have ordered a urinalysis and a urine culture "to look for evidence of white blood cells and red blood cells and bacteria in the urine." TT, Nov. 5, p. 163, lines 1–2. Upon being shown a lab report indicating that a urinalysis had indeed been ordered by Dr. Mayer, Dr. Gallagher noted

that the protein reading of 51 to 199 in that test was abnormal, but he did not comment on the white blood cells, red blood cells, and bacteria readings.

In sum, Dr. Gallagher was hard pressed to find anything at all correct in Dr. Mayer's work on March 11, 1989.

*Dr. Mecikalski:*

Plaintiffs also submitted the deposition of Mark B. Mecikalski, M.D. Dr. Mecikalski is Board Certified in Internal Medicine, Pulmonary Medicine and Critical Care Medicine. He has been practicing in Tucson, Arizona, since 1983. After his internship he worked in emergency rooms for one year in the Los Angeles area. In the Spring of 1989, he was a consulting physician at Kino.

Dr. Mecikalski first saw decedent on March 13, 1989. He was called in for a consult from Pulmonary. By the time Dr. Mecikalski saw him, decedent was unresponsive and already on a ventilator receiving respiratory support. Dr. Mecikalski reviewed the Kino x-rays, which were portable x-rays, and determined that decedent had a rapid development of right upper lobe infiltrate and that the infection was limited to the right upper lobe. That diagnosis comports with the testimony of the other pulmonary expert, Dr. Bloom, that decedent's pneumonia probably developed rapidly, after decedent was seen by Dr. Mayer in the LSU. Dr. Mecikalski testified that pneumonia can come on in as short a time period as six hours.

*Dr. Hoffman:*

Richard Hoffman, M.D., was subpoenaed by plaintiffs. Dr. Hoffman was employed at the VAMC the weekend of March 11, 1989. It was his responsibility to review charts from the weekend on the following Monday. Accordingly, he reviewed decedent's charts on March 13, 1989.

---

trial testimony was that decedent did not develop a cough prior to collapsing in the bathroom. However, when reminded of her deposition testimony that decedent was coughing "[f]rom time to time," she responded that her "husband always would cough" but that on Saturday and Sunday "he didn't have a cough. From time to time he would cough." TT, Jan. 7, p. 29, lines 13–22.

**9.** There is nothing in the record to support Dr. Gallagher's claim that Dr. Mayer authored the "cough" notation on the x-ray requisition form. Dr. Mayer and Dr. Hoffman testified that the form carrying the "cough" notation could have been filled out by a clerk or a nurse, and Nurse Goldthorpe concurred. See Miscellaneous Criticisms, this Opinion, page 1460.

At trial, Dr. Hoffman was asked about his earlier deposition testimony stating that decedent's March 11, 1989 x-ray "did have an infiltrate." TT, Jan. 17, p. 153, lines 18–19. He testified that the transcript "is inaccurately transcribed because he [decedent] did not have an infiltrate on the x-ray that day." TT, Jan. 17, p. 153, lines 23–24.

Dr. Hoffman also asserted that "[t]he gold standard for pneumonia still would be his chest x-ray." TT, Jan. 17, p. 153, lines 2–3.

## DEFENDANT'S EVIDENCE

Two experts, Dr. Van Nostrand and Dr. Bloom, testified on behalf of defendant.

Defendants also called Paula Goldthorpe, the nurse practitioner who was on duty with Dr. Mayer on March 11, 1989.

What follows is a brief summary of the testimonies of each physician and the nurse practitioner, followed by their opinions as to the specific criticisms raised by plaintiffs.

*Dr. Van Nostrand:*

Willard Van Nostrand, M.D., an emergency medicine physician at St. Mary's Hospital in Tucson, Arizona, testified for the defense. Dr. Van Nostrand completed one year of a radiology residency before changing to full time emergency medicine. That experience afforded him considerably more training in radiology than the average emergency room physician. Dr. Van Nostrand testified that Dr. Mayer's care and treatment of Mr. Valencia was appropriate and fell within the standard of care in Arizona.

Dr. Van Nostrand testified that he would have reached exactly the same diagnosis as did Dr. Mayer. Moreover, Dr. Van Nostrand would have ordered the same treatment.

With regard to the LSU Report prepared by Dr. Mayer in connection with her examination and treatment of Mr. Valencia, Dr. Van Nostrand opined that Dr. Mayer's record keeping was adequate and that the report's subjective and objective findings were sufficient to give him "a feeling for the case and a feeling for the man as he presented" on March 11, 1989, in the LSU. TT, Jan. 16, p. 12, lines 7–8.

With regard to Dr. Mayer's summary of decedent's past medical history, Dr. Van Nostrand considered it "an exemplary review of the past medical records" containing abundant "in-depth review of the patient's records." TT, Jan. 16, p. 17, line 25; p. 18, line 2. Dr. Van Nostrand believed that he would have reached the same diagnosis and would have ordered the same plan of treatment as Dr. Mayer. Moreover, there were no tests that Dr. Mayer should have performed that she did not perform.

*Dr. Bloom:*

John William Bloom, M.D., also testified for the defense. He is Board Certified in Internal Medicine, Pulmonary Medicine and Critical Care Medicine. He is an associate professor at University Medical Center (UMC), in Tucson, Arizona, an attending physician on the Pulmonary Service and Intensive Care Unit, and he is the Medical Director of the Intensive Care Unit. In addition to teaching and conducting research in asthma and COPD, Dr. Bloom has published and lectured specifically on COPD and the proper treatment of pneumonia. He also works on heart-lung transplants at UMC. When attending on the Pulmonary Consult Service, he reads about twenty-five (25) x-rays a day. Dr. Bloom shares with Dr. Van Nostrand the conclusion that Dr. Mayer's care and treatment of Mr. Valencia on March 11, 1989, fell within the standard of care. Indeed, he opined that her care of decedent was excellent.

Here follows a summary of Dr. Van Nostrand's and Dr. Bloom's evaluations of Dr. Mayer's work, specifically those aspects of her work deemed to be erroneous by Dr. Gallagher.

1. The RR:

As to decedent's RR of 20, Dr. Van Nostrand contradicts Dr. Gallagher's opinion that decedent's RR was high. Dr. Van Nostrand found an RR of 20 to be in the upper limit of normal. He noted that various factors can raise the RR: testifying, paramedics, fever, chills, anxiety, and chest pain. An elevated RR is a "rather non-specific index." TT, Jan. 16, p. 21, line 8.

Dr. Van Nostrand does not consider the omission of the RR from the LSU report a fall below the standard of care because "[t]he real measure of ventilation, which is what respiratory rate was trying to get to, is available through the arterial blood gases," tests which Dr. Mayer did in fact run. TT, Jan. 16, p. 21, lines 23–25.

Dr. Bloom's testimony was in accord with that of Dr. Van Nostrand. As to Dr. Gallagher's statement that a respiratory rate of 20 was abnormally high, Dr. Bloom testified, "No, it's not a high rate. A respiratory rate of 17 is normal with an upper range of the limit ... is 22." TT, Jan. 17, p. 58, lines 1–3. More importantly, a patient suffering from COPD will have a slightly elevated RR. "[T]here's rarely a patient when they are chronically, stabley [sic] ill, not acutely ill, it's rare that their rate is below 20, actually." TT, Jan. 17, p. 58, lines 6–9.

Regarding Dr. Mayer's failure to record Mr. Valencia's RR, Dr. Bloom opined that it does not mean she did not evaluate his respiration, "It's often not recorded." TT, Jan. 17, p. 59, line 4.[10] Moreover, "[s]he did a blood gas which certainly evaluates his pulmonary status well beyond a respiratory rate." TT, Jan. 17, p. 59, lines 5–7.

2. Time Lapse Between Removal of Oxygen and Drawing of Blood:

Dr. Van Nostrand agreed with Dr. Gallagher that 12 liters of oxygen are a large amount to give an individual.

He testified that he was trained to wait 20 minutes to 30 minutes before drawing a blood gas sample. However, he did not do any type of analysis to determine whether Mr. Valencia's blood gas readings were accurate in terms of when the blood was drawn. As to the rationale underlying that wait period, Dr. Van Nostrand would defer to a pulmonologist.

Dr. Bloom disagreed with Dr. Gallagher as to why it is advisable to wait approximately 20 minutes after removing oxygen to draw blood for ABGs.

Dr. Bloom was emphatic in explaining that the reason is not because the oxygen levels will be faulty if the blood is drawn too soon. "It has nothing to do with the oxygen.... you don't store oxygen at all in your body." TT, Jan. 17, p. 21, lines 1, 8–9.

Dr. Bloom also pointed out that since blood circulates in less than a minute, it takes only a couple of minutes for the oxygen level to decrease in the blood after supplemental oxygen is removed. Therefore, there is no need to wait 10 or 20 minutes before drawing blood for an accurate oxygen reading.

Even assuming that Dr. Mayer waited only 10 minutes, there would still not be a false elevated $PO_2$ in the blood.

Dr. Bloom responded when asked whether or not the 12 liters of oxygen given decedent by the paramedics as he was on his way to the VAMC in any way affected Mr. Valencia's blood gas levels, "I do not think that that supplemental oxygen that he was given on the way to the VA raised his $PO_2$ value at all." TT, Jan. 17, p. 115, lines 16–18.

*Nurse Goldthorpe:*

Paula Goldthorpe, R.N.P., who has worked at the VAMC since 1973 and is currently employed as a nurse specialist in cardiology, was working in the LSU on March 11, 1989. She reviewed the VAMC records related to the blood tests run on decedent and found that the time the ABG test was actually run was 8:43 a.m. She testified that it is standard procedure to place the blood for ABGs on ice immediately after it is drawn and to deliver it immediately to the lab for testing. If that is not done, the blood will coagulate, clogging the machine and rendering it useless for testing. She testified that the blood for decedent's ABGs would have been drawn 10 to 15 minutes prior to the 8:43 testing time.

As to Dr. Gallagher's opinion that the "8:00 sent PG" notation refers to the time when the ABG blood was sent to the lab, Nurse Goldthorpe testified that she wrote that note and could only assume that it refers to the time the venous bloods were sent to the lab since she doesn't specifically remember the

---

10. This is corroborated by the fact that the LSU form bears no block or designated space for the recordation of RR, as it does for other vital signs. See this Opinion, page 1461.

incident involving decedent. The "8:00 sent" time is consistent with the 8:23 venous blood test time shown on the computer printout. Defendant's Exhibit 26, p. 15.

3. Interpretation of the ABG Results:

Dr. Van Nostrand testified that the $PO_2$ of 65 was consistent with a person suffering from COPD because that individual gets used to living with a lower oxygen level and does not experience shortness of breath. "[T]he 65 is low but not really a source of concern here." TT, Jan. 16, p. 70, line 15.

Dr. Van Nostrand agreed with Dr. Gallagher that the $PCO_2$ of 48 is high. However, that reading, too, is not a cause for concern where the patient has COPD because it reflects the natural progression of the disease. A patient with COPD in time becomes less able to get oxygen into the body and less able to get carbon dioxide out, hence the $PCO_2$ gets higher and the $PO_2$ gets lower.

Dr. Bloom agreed with Dr. Van Nostrand that the $PO_2$ level of 65, given decedent's history and COPD, is not consistent with pneumonia. Dr. Bloom further stated that a higher $PO_2$ could be expected in Phoenix, where Dr. Gallagher practices, because of the lower altitude.

4. Comparison of March 11, 1989 ABGs With Those of May 13, 1988:

Dr. Van Nostrand testified it was reasonable and within the standard of care for Dr. Mayer to rely on the blood gases from May 13, 1988, as baseline blood gases for decedent. He would have done the same thing. The May 13, 1988 ABGs show how effectively decedent's lungs were functioning at a time when the doctors felt he was well enough to be discharged, after treatment for pneumonia. Moreover, Plaintiffs' Exhibit 6 reveals that the $PO_2$ of 65 on May 13, 1988, is significantly higher than the readings ob-

tained when decedent was first hospitalized on May 8, 1988.

Dr. Bloom agreed that it was appropriate for Dr. Mayer to rely on the May 13, 1988 ABGs as a reasonable baseline blood gas for comparison because the pneumonia decedent had been treated for was resolving at that time.

5. Interpretation of the CBC and Differential Results:

As to the WBC of 19.1, Dr. Van Nostrand agreed with Dr. Gallagher that it was elevated. An elevated WBC can result from fever, infection, stress, or a disease like lymphoma. However, contrary to Dr. Gallagher, Dr. Van Nostrand testified that a WBC cannot stand alone as a test, as can a chest x-ray. Dr. Van Nostrand would not admit somebody to the hospital solely for an elevated WBC.

Dr. Van Nostrand testified that even though a high WBC of 19.1 in all probability could indicate a bacterial infection, the absence of a productive cough and a negative chest x-ray rules out pneumonia. He was quite emphatic in testifying that there is no way for a treating physician to diagnose pneumonia where no infiltrates show in the x-ray. Hence, he confirmed Dr. Mayer's conclusion that the WBC was consistent with a viral syndrome was a reasonable one.

As to Dr. Gallagher's testimony that the WBC, segs, bands, and lymphocytes would more likely indicate a bacterial infection as opposed to a viral infection, Dr. Van Nostrand agreed. However, Dr. Van Nostrand testified that those results standing alone are not sufficient to reach a conclusion as to whether the patient is suffering from a bacterial or a viral infection.

Dr. Bloom agreed with Dr. Gallagher and Dr. Van Nostrand that a 19.1 WBC is a high WBC consistent with a bacterial infection, but he also agreed with Dr. Van Nostrand that it is similarly consistent with a viral infection and may even result from stress.[11]

11. For example, a patient who has been in an automobile accident and suffers a broken leg or a ruptured spleen will have a WBC as high as 19.1, or often higher, in the stress of the episode. Hence, that reading alone will not support a conclusion as to whether or not a patient has a bacterial or a viral syndrome.

As another example, Dr. Bloom referred to an LSU report of decedent's visit to the LSU on September 22, 1986, Defendant's Exhibit 27, pp. 53, 128–129. At that time, Mr. Valencia had a WBC of 18,400 or 18.4. He was diagnosed as having a viral gastritis and sent home.

**1458**

6. Use of the Portable X-ray:

Dr. Van Nostrand testified that the difference in effectiveness between portable x-rays and two-view x-rays taken in the Radiology Department is "almost negligible." TT, Jan. 16, p. 27, line 21. The technology has changed drastically in the last 20 years. Dr. Van Nostrand pointed out that even though a portable chest x-ray may be used in the emergency room, it is operated by radiology technicians from Radiology.

Dr. Van Nostrand said that the evaluation of a patient presenting with chest pain creates a situation where time is of the essence because chest pain deeply concerns medical staff. Hence, the system that has developed addresses the need to save time. Accordingly, the patient stays put and all the services are brought to the patient. That explains why the use of a portable chest x-ray in this situation, where the chief complaint was chest pain, falls within the standard of care in Arizona.

Dr. Van Nostrand testified that it is the standard of care in Arizona for the emergency room physicians, who are on duty 24 hours a day, to review the chest x-ray, make an interpretation, and decide whether or not to admit a patient without consulting the radiologists. Radiologists are not on duty 24 hours a day.

As to the x-ray taken March 11, 1989, while it is not an ideal x-ray, Dr. Van Nostrand testified that it is not technically inadequate and Dr. Mayer was within the standard of care to rely on it. That x-ray showed no infiltrate within either of the two lungs. The radiologist, who subsequently read the x-ray about 48 hours after Dr. Mayer did, reached the same conclusion: no infiltrates.

Dr. Mayer and Dr. Van Nostrand both testified that it is customary for a radiologist to include language recommending standard film when a portable x-ray has been used. Dr. Van Nostrand also testified that radiologists are taught to comment on the technical quality of an x-ray. For instance, if the x-ray was inadequate to interpret, then the radiologist is taught to say so and to say that he cannot rely upon the interpretation. Hence, Dr. Van Nostrand concluded that the fact that the radiologist did offer an interpretation means that the radiologist did not find the x-ray inadequate to do so. That conclusion is additional support for his belief that Dr. Mayer was within the standard of care in relying upon the portable x-ray.

Dr. Van Nostrand would not diagnose pneumonia where the chest x-ray is negative. A chest x-ray with infiltrates is the "gold standard" in diagnosing pneumonia, "[a]nd if there's no infiltrate, then there is no pneumonia." TT, Jan. 16, p. 38, lines 11, 23–24.

Dr. Van Nostrand agreed with Dr. Mayer that sending decedent to the Radiology Department was contraindicated by his severe chest pain. Chest pain requires that the patient be watched. In order to have the x-ray taken at Radiology, decedent would have had to be sent a distance of approximately one city block, on a stretcher, where he then would have awaited the availability of the x-ray room and a technician. After the x-ray was taken, decedent would have had to wait for it to be developed before he and the x-rays could finally return to the emergency room. That can take 30 minutes to an hour.

Dr. Van Nostrand also believed that it was appropriate for Dr. Mayer to compare the March 11, 1989 x-ray with the May 13, 1988 x-ray taken when decedent had been treated for pneumonia.

Dr. Bloom also disagreed with Dr. Gallagher's criticism of the use of a portable x-ray. It is his opinion that a two-view x-ray is not necessary to assess pneumonia. And, as to the specific x-ray Dr. Mayer relied upon, Dr. Bloom agreed with Dr. Gallagher that it is underpenetrated. However, Dr. Bloom opined that the underpenetration would make pneumonia more likely to be visible. The quality of the x-ray "is fine to see if there's pneumonia there." TT, Jan. 17, p. 41, lines 19–20.

Indeed, Dr. Bloom noted that the right upper lobe area, where the pneumonia shows up on the March 12, 1989 Kino x-ray, "appears very clearly [on the March 11, 1989 LSU x-ray] and there's no evidence of pneumonia on that area, not even in hindsight which is often the case when you see a pneumonia that pops up a day or two la-

ter...." TT, Jan. 17, p. 40, lines 21–25. He was emphatic that "[t]here's no evidence—I have looked very carefully.... there's no evidence...." TT, Jan. 17, p. 41, lines 3–6.

As to whether or not pneumonia could have developed so quickly from Saturday morning to Sunday evening, Dr. Bloom testified, "Certainly. Obviously did. Pneumonia can develop rapidly. Pneumococcal pneumonia can develop rapidly." TT, Jan. 17, p. 43, lines 12–14.

Dr. Bloom testified that a chest x-ray is the one single most important factor in making a determination as to whether or not a patient has pneumonia. "If you don't see pneumonia on the chest x-ray, your determination is there's not pneumonia." TT, Jan. 17, p. 47, lines 24–25. In response to Dr. Gallagher's testimony that a chest x-ray can lag pneumonia, that is, the x-ray would not show pneumonia even though a patient had the disease, Dr. Bloom testified that can occur, but rarely, in narrow and unusual circumstances.[12] Dr. Bloom found no evidence of such circumstances in decedent.

7. Refusal to Admit for Observation or Provide Home Oxygen:

Dr. Van Nostrand testified that home oxygen would have been inappropriate. Oxygen is a prescription medication, and decedent's oxygen saturation was in the normal range. He did not need additional oxygen. He agreed with Dr. Mayer that it was appropriate not to have decedent return to the hospital because the call came within two hours of the LSU visit and the family reported his condition had not worsened. Dr. Van Nostrand would not have granted the family's request that decedent be admitted for obser-

vation because "stresses on the health care delivery system now require that there be reasons to put somebody in the hospital...." TT, Jan. 16, p. 75, lines 16–18. Observation is not one of them.

Contrary to Dr. Gallagher, Dr. Van Nostrand would not have admitted decedent for a high WBC.

Dr. Van Nostrand further disagreed with Dr. Gallagher about admitting decedent, an emphysemic, for hypoxia. "Admission for chronically low emphysemic levels of oxygen is not a reason to admit to the hospital." TT, Jan. 16, p. 78, lines 13–15. Decedent had a "standard low" because of his emphysema. TT, Jan. 16, p. 78, line 18. Dr. Van Nostrand testified that the low level for admission is 60. Decedent's oxygen was 65.[13]

Dr. Van Nostrand disagreed with Dr. Gallagher's statement that Mr. Valencia should have been treated with oxygen therapy and antibiotics. Indeed, he believed oxygen therapy was contra-indicated. "[P]eople with emphysema can actually die with normal levels of oxygen as the carbon dioxide gets higher ... I would not have admitted him for carbon dioxide retention." TT, Jan. 16, p. 79, lines 13–19. That is the "classical double bind that we get into with people with emphysema. If we give him oxygen, his oxygen goes up but so does the carbon dioxide. And the carbon dioxide gets higher and it becomes a poison." TT, Jan. 16, p. 79, lines 9–13.

Dr. Van Nostrand also disagreed with Dr. Gallagher's opinion that decedent should have been started on antibiotics. Dr. Van Nostrand does not start patients on antibiotics with decedent's symptoms unless there is also a productive cough.[14]

---

12. Pneumonia infiltrates in an x-ray are actually the white blood cells, in fluid, drawn to the infected area to fight the infection. On the x-ray film, that fluid stops the x-ray from penetrating and manifests as lighter than the surrounding area. As an example of circumstances where the x-ray would lag pneumonia, Dr. Bloom explained that in a case where an individual has had chemotherapy and has a low white blood cell count, that individual would also be dehydrated, so there would be few white blood cells going to the infected area and little fluid.

13. For example, there are people with emphysema who can function with levels of oxygen as low as 50, but if a person who is not diseased has a level that drops to 50 because of pneumonia, that person would have been admitted.

14. He gave as an example a well documented viral condition, pleurodynia, which attacks the lining of the lungs, causing pleuritic pain and shortness of breath, and presents in exactly the same manner as decedent and shows a negative chest x-ray. Therefore, Dr. Van Nostrand doesn't start a patient with decedent's symptoms

Dr. Bloom's testimony is in accord with that of Dr. Van Nostrand. As to Dr. Gallagher's statement that he would have admitted Mr. Valencia on March 11, 1989, for oxygen therapy, Dr. Bloom testified that "A $PO_2$ value of 65 is not low" and is not "any reason for concern," especially for decedent whose $PO_2$ of 65 was chronic, not acute. TT, Jan. 17, p. 38, lines 5, 17–18.

As to whether Dr. Bloom would have treated with antibiotic therapy, as Dr. Gallagher would have done, Dr. Bloom disagreed: "Just because you have a high white blood cell count does not mean that you definitely have a bacterial infection" treatable with antibiotics. TT, Jan. 17, p. 55, lines 9–11.

In response to Dr. Gallagher's claim that he would have tried to diagnose a bacterial infection with repeated blood cultures, Dr. Bloom disagreed with that as well. He did not find from the records any evidence that Mr. Valencia had a bacterial infection, or even sufficient evidence to support a suspicion that he had a bacterial infection.

Dr. Bloom would not have readmitted decedent in response to the phone call received from the family two hours after decedent left the LSU. "I wouldn't admit him to the hospital for an observation without some evidence of an illness or worsening." TT, Jan. 17, p. 57, lines 4–6.

Finally, Dr. Bloom felt that Dr. Mayer's treatment plan, "[b]edrest," "[l]ots of fluids,", no alcohol or cigarettes, Tylenol and "[r]eturn if worsening" symptoms, especially "productive cough" and "[c]ontinue seizure meds," was "[p]erfectly appropriate. I don't see anything that's missing from the plan that I would have suggested." TT, Jan. 17, p. 61, lines 16–18.

8. Miscellaneous Criticisms:

Regarding the discrepancy between the LSU report's "no cough" notation and the contrary Diagnostic Radiology Report, both of which Dr. Gallagher attributed to Dr. Mayer, both Dr. Mayer and Dr. Hoffman testified that the x-ray requisition form which included the "cough" notation could have been filled out by a clerk or a nurse. In fact, Dr. Mayer testified that she did not think that she had filled out the form, and Nurse Goldthorpe testified that, although she couldn't remember, she may have written the notation. Dr. Mayer testified that "[m]ost of the time I don't fill that out; but there should be a requisition filled out by the clerk." TT, Nov. 7, p. 131, line 25, p. 132, line 1.

Dr. Van Nostrand said that it is not unusual for a doctor, as he or she is assessing a patient, to change his or her mind on a diagnosis or on objective or subjective findings. As to Dr. Mayer's use of white-out, Dr. Van Nostrand and Dr. Bloom agreed with Dr. Gallagher that the use of white-out was inappropriate, but both testified that the use of white-out does not fall below the standard of care.

Contrary to the significant distinction attached by Dr. Gallagher to shivering and rigors, Dr. Van Nostrand considered the difference between shivering and rigors to be a semantic one. Dr. Bloom testified that rigors does not necessarily mean a bacterial infection. "If you looked at, you know, 100 cases of people having rigors in a row, most of them would be viremia." TT, Jan. 17, p. 105, lines 2–4.

## DISCUSSION

### Cause of Death

Cause of death is uncertain. Plaintiffs' expert, Dr. Gallagher, an emergency room physician, testified that to a medical probability, decedent's combination of COPD and pneumonia rendered him vulnerable to cardiac arrest, which would have been avoided had he been treated for pneumonia.

Defendant's expert, Dr. Bloom, a pulmonologist, stated that it is impossible to be precise about what caused Mr. Valencia's cardiopulmonary arrest.[*] The arrest could have resulted from pneumonia which developed after he left the LSU and progressively got worse, or it could have resulted from a seizure and aspiration, or a combination of

---

on antibiotics unless there is also a productive cough.

[†] Amended pursuant to Court's Order filed January 29, 1993.

both. Aspirated pneumonia was rejected by Dr. Silver, the pathologist, as a cause of death, because he did not find any vegetable particles in the microscopic sections,[15] but Dr. Bloom testified that since Mr. Valencia was on a ventilator with an endotracheal tube, any vegetable particles would have been sucked out.

Moreover, Dr. Bloom said the difficulty in determining the cause of cardiopulmonary arrest is compounded by the fact that tests at Kino revealed that Mr. Valencia's serum sodium level of 114, the measure of salt in the blood, was very low. If that level dropped to 114 rapidly, that would probably cause a seizure. With that drop in the sodium level from 133 to 114, "[y]ou could be in a coma." TT, Jan. 17, p. 70, lines 15–16.

The other value that changed markedly in decedent was his creatinine value, a measure of kidney function. At the LSU, decedent's creatinine value was .8, which is well within the normal range, but at Kino it was 3.5. That means that the kidneys were not working properly. According to Dr. Bloom, the sudden change in decedent's creatinine level is "a mystery" and "suggests that maybe there was some muscle breakdown or something else going on." TT, Jan. 17, p. 70, lines 3–5.

The pathologist, Dr. Arthur Silver, in his Final Pathologic Diagnoses, found that the cause of death was "[c]erebral ischemia secondary to cardiopulmonary arrest due to pneumonia." Plaintiffs' Exhibit 4, p. 192. That is in accord with plaintiffs' expert, Dr. Gallagher. However, at trial on the matter, Dr. Silver testified that at the time he did his Final Pathologic Diagnoses he was unaware of decedent's COPD. He further testified that there is a medical probability that decedent died from a seizure, independent of that pneumonia.*

The fact that decedent often failed to take his medications complicates matters. Family members were unsure when he last did so prior to March 12, 1989. His last seizure was January, 1989. That, combined with Mrs. Valencia's testimony that seizures occurred once a month or every two to three months, lends support to Dr. Bloom's and Dr. Silver's testimony that decedent may have had another seizure.

While it appears clear on this record that decedent most probably did not have pneumonia when seen at the LSU on March 11, 1989, and most probably did develop pneumonia by the time he was seen at Kino on March 12, 1989, it is impossible for the court to determine the cause of Mr. Valencia's death. The experts' opinions, including those of the pathologist rendered before and after he had full knowledge of decedent's medical history, are tentative and contradictory, and the evidence considered as a whole renders impossible a conclusion as to the cause of death.*

*Dr. Mayer's Diagnosis and Treatment of Mr. Valencia on March 11, 1989:*

Plaintiffs' case rests on the testimony of Dr. Gallagher, who found extensive fault with Dr. Mayer's work. The problem with Dr. Gallagher's claims is that they rest in part upon opinions which are largely refuted by all of the other experts, and they rest in part upon suppositions, or mere speculations, which are unsupported by any evidence or, indeed, which are disputed by the evidence.

Regarding decedent's RR, Dr. Mayer agreed with Dr. Gallagher that the RR is a vital sign that should be recorded. However, although the parties do not address the following, the Court notes that the LSU form, which bears blocks and blank spaces for the recordation of such vital signs as the patient's temperature, pulse, and blood pressure, does not bear any designation for RR. Moreover, a review of the ten reports memorializing decedent's visits to the LSU on March 11, 1989, and nine visits prior, reveals that two different forms were used. In 1987, a form captioned "Medical Certificate" was used. The face of that form has a space or .

---

**15.** Aspirated pneumonia occurs when the patient regurgitates material from the stomach which would contain bacteria.

* Amended pursuant to Court's Order filed January 29, 1993.

block marked "Respiration." Decedent's RR was recorded on only one of the five occasions he sought treatment in 1987. In 1988, decedent visited the LSU on four occasions. The form used on all four of those occasions, captioned "Triage/LSU," bears no place for the recording of a patient's RR. That record corroborates Dr. Bloom's testimony that a patient's RR is often not recorded.

Dr. Mayer had for evaluation both the RR taken by the paramedics and the ABG results. According to the other experts, an RR is not essential and the ABG results were the better measure of decedent's ventilation and provided Dr. Mayer with a good evaluation of his pulmonary status.

Dr. Gallagher's supposition that the time lapse between removal of the supplemental oxygen and the drawing of blood for ABGs was 10 minutes or less is inconsistent with the evidence. Hospital records and the testimony of Nurse Goldthorpe support the conclusion that the time lapse was closer to 30 minutes—from shortly after 7:50 a.m. to approximately 8:30 a.m. That evidence is sufficient to render dubious Dr. Gallagher's speculation that the blood was drawn too soon.

Moreover, assuming *arguendo* that the time lapse was less than 20 minutes, Dr. Bloom's testimony severely undermined Dr. Gallagher's claims about the reason for, and consequences of, that time lapse. Dr. Bloom explained that the time lapse has nothing at all to do with obtaining an accurate oxygen reading. In light of Dr. Gallagher's admission at trial that a pulmonologist would have more expertise than he on precisely that point, and his deposition testimony that because he was not a pulmonologist he wouldn't give an exact number regarding the required minutes, one of the cornerstones of Dr. Gallagher's extensive criticism of Dr. Mayer's work—the time lapse between removal of supplemental oxygen and the drawing of blood for ABGs—is dislodged as irrelevant and wrong. The record reveals no reason to believe that the ABG results were faulty.

Dr. Gallagher's suspicion that Dr. Mayer changed "having rigors" to "shivering" with the intent to change a symptom of a bacterial infection to a symptom of a viral infection is merely that and is severely undermined by the testimony of the other experts who attributed no significant difference in meaning to those words.

As to the x-ray, Dr. Gallagher stands alone in his opinion that Dr. Mayer should not have relied upon that portable x-ray. Portables are customarily relied upon in emergency room situations. Moreover, the exigency of the instant circumstances justified the use of a portable x-ray and was well within the standard of care. Significantly, only Dr. Gallagher found fault with the sufficiency of the technical quality of the x-ray to reveal pneumonia.

The opinions of defendant's experts as to the quality of that x-ray are supported further by the fact that the VAMC Radiologist, who read the x-ray two days later, also relied upon it to render a reading and also found no infiltrates, hence no pneumonia. Although he recommended that standard film be taken, the VAMC Radiologist obviously found the portable x-ray to be sufficient to interpret because he did so.

Only Dr. Gallagher believed that pneumonia can be diagnosed absent infiltrates on the lungs. The court accepts and relies upon the unanimous testimony of the other experts, and that of the physician subpoenaed by plaintiffs, that the x-ray is the gold standard for determining pneumonia, and that if there is no infiltrate on the x-ray, there is no pneumonia.

Parenthetically, the court notes that the x-ray relied upon two days later at Kino was also a portable x-ray.

Regarding the use of the May 13, 1988 ABGs as decedent's baseline for comparison to the March 11, 1989 results, a review of the hospital records in the days immediately preceding May 13, 1988, shows that decedent's $PO_2$ on that date was significantly improved from the days immediately prior when he was suffering from pneumonia. Hence, the May 13, 1988 $PO_2$ reflects decedent's condition when the pneumonia was resolving and doctors felt that he was well enough to go home.

As to Dr. Gallagher's belief that Dr. Mayer was responsible for the contradictory cough

notations, his belief is merely that. Nothing in the record supports that opinion. The evidence, including the testimony of Nurse Goldthorpe, who testified that she herself may have made the radiology notation, supports a contrary finding.

Dr. Mayer's refusal to admit decedent in response to the telephone call made to her by the family two hours after decedent left the LSU comports with the testimony of other experts that admission or refusal to admit over the telephone is improper. The record is clear that Dr. Mayer instructed the family to bring decedent back to the LSU if his condition worsened or if he developed a productive cough. Testimony of family members was that decedent's worst condition occurred at the LSU. The record is also clear that at no time during that call did the family tell Dr. Mayer that decedent's condition had worsened or that decedent had developed a productive cough.

### CONCLUSIONS OF LAW

1. Plaintiffs bring this action under the Federal Tort Claims Act (FTCA), 28 U.S.C. § 2671 *et seq.*

2. This court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1346(b) and 636(c).

3. In actions brought under the FTCA, the liability of the government is determined in accordance with the substantive law of the place where the act or omission occurred. *Aguilar v. U.S.*, 920 F.2d 1475, 1477 (9th Cir.1990); 28 U.S.C. § 1346.

4. The alleged malpractice in this case occurred at the VAMC in Tucson, Arizona; therefore Arizona substantive law controls.

5. In Arizona, liability for medical malpractice actions is determined pursuant to Arizona Revised Statutes, Section 12–561 *et seq.*

6. Arizona Revised Statutes, § 12–561(2) defines medical malpractice as follows:

> "Medical malpractice action" or "cause of actions for medical malpractice" means an action for injury or death against a licensed health care provider based upon such provider's alleged negligence, miscon-

duct, errors or omissions, or breach of contract in the rendering of health care, medical services, nursing services or other health-related services or for the rendering of such health care, medical services, nursing services or other health-related services, without express or implied consent.

7. The elements of proof necessary to support a medical malpractice action are found in A.R.S. § 12–563:

> The following shall be necessary elements of proof that injury resulted from the failure of a health care provider to follow the accepted standard of care:
>
> 1. The health care provider failed to exercise that degree of care, skill and learning expected of a reasonable, prudent health care provider in the profession or class to which he belongs within the state acting in the same or similar circumstances; and
>
> 2. Such failure was a proximate cause of the injury.

8. Arizona Revised Statutes, § 12–563, governs plaintiffs' burden of proof in medical malpractice cases. In order to satisfy the requirement of establishing a standard of care and a deviation from that standard, plaintiffs must present evidence that the health care provider failed to exercise the degree of care, skill and learning expected from a reasonable, prudent health care provider in the profession to which he or she belongs under the same or similar set of circumstances in the state of Arizona. *Bell v. Maricopa Medical Center,* 157 Ariz. 192, 194–195, 755 P.2d 1180, 1182–1183 (App. 1988); A.R.S. § 12–563.

9. Plaintiff must normally present expert evidence of the accepted conduct of the profession and the defendant's deviation from that standard unless the negligence is so grossly apparent that a layman would have no difficulty in recognizing it. *Peacock v. Samaritan Health Serv.,* 159 Ariz. 123, 765 P.2d 525 (App.1988).

10. The standard of care must be established by specific evidence. *Johnson v. University Hospital,* 148 Ariz. 37, 47, 712 P.2d 950, 960 (App.1985), overruled on other

grounds, *Dunn v. Carruth,* 162 Ariz. 478, 481, 784 P.2d 684, 687 (1989). It cannot rest upon conjecture or inference. *Id.*

 11. Proximate cause is by statute an element of every medical malpractice action, regardless of the theory of the case. A.R.S. § 12–563.

 12. Plaintiffs must present facts from which negligence and a causal relation between the injury and the defendant's acts may be reasonably inferred. *Harvey v. Kellin,* 115 Ariz. 496, 566 P.2d 297 (1977).

 13. The court "must find for the defendant unless [it] finds[s] a *probability* that defendant's negligence was a cause of plaintiff's injury." *Thompson v. Sun City Community Hosp., Inc.,* 141 Ariz. 597, 608, 688 P.2d 605, 616 (1984) (emphasis in original).

 14. Upon a full trial on the matter and upon evaluating the evidence and the arguments and briefs of counsel and the entire record as a whole, the court concludes that plaintiffs have failed to sustain their burden of proving by a preponderance of the evidence that Dr. Mayer failed to exercise that degree of care, skill and learning expected of a reasonable, prudent health care provider in her diagnosis and treatment of Mr. Valencia, Sr. on March 11, 1989, in the following particulars: omission of the RR, time lapse allowed between removal of supplemental oxygen and drawing of blood for ABGs, interpretation of the ABGs, comparison of March 11, 1989 ABGs to May 13, 1988 ABGs, interpretation of the CBC and Differential, use of the portable x-ray, refusal to admit for observation or provide home oxygen in response to the telephone·call, and the remaining miscellaneous criticisms raised by plaintiffs.

15. The court finds that Dr. Mayer's conduct in all those particulars fell within the standard of care in Arizona.

16. Plaintiffs have failed to meet their burden of proving by a preponderance of the evidence that defendant's care and treatment of Mr. Valencia on March 11, 1989, was a proximate cause of his death on March 15, 1989.

17. Based upon these findings, it is the court's conclusion that plaintiffs are not entitled to recover as a matter of law.

NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED that plaintiffs take nothing by reason of their complaint against defendant.